# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

**BELLA COLLINA PLAINTIFFS:**                    Case No.: 07-
FRANK AWDISH, FADI HAKIM,                        Hon:
AMIR NAFSO, RAMY SESI ALBERT JONNA,
GRACE JONNA, MIKE JONNA, TIM FOUMIA,
SAM DENHA, JOHNNY KARMO,
NAMIR NANNOSHI, IMAN NANNOSHI,
SAAD NANNOSHI, ISAM JONNA, STEPHEN NAJOR,
VINCENT NAJOR, NABIL NANNOSHI, SAM NANNOSHI,
VERA NANNOSHI, JACK ABBO, IMAD JONNA,
JAMILA JONNA, RONNIE BOJI, MAJED DABISH,
SYLVIA DABISH, ALLAN SAROKI, KEVIN ATCHOO,
LOUIE BARBAT, LARRY NAJOR, RAMIZ SHEENA,
BRIAN YALDOO, FARIS NAIMI, KEVIN JAPPAYA, SHAWN
JAPPAYA, DONALD GEORGE, RONNIE JAMIL, RAYMOND
HESANO, GHASSAN ALKAMANO, JENNIFER ALKAMANO,
WAAD KHEMMORO, RAMZI FARAJ, FAIZ MANSOUR,
PAUL GEORGE.

**REUNION PLAINTIFFS:** BASSAM MURAD,
SAAD NANNOSHI, KO FLORIDA PROPERTIES, INC.,
SAM OROW, AMIR NAFSO, ANDREW NAJOR,
AMAR TOMA, DAVID KASHAT, ROGER DENHA

**TESORO PLAINTIFFS:** SAAD NANNOSHI,
KEVIN JAPPAYA, TERRY FARIDA, RAMIZ SHEENA,
FRANK AWDISH, FADI HAKIM, D.H.G. PROPERTIES, LLC,
DONALD GEORGE, JIMMY RABBAN, NABHAN MEKANI,
RONNIE BOJI, ALBERT JONNA, JULIAN JADDUA
NANCY ELIA, ATHIR NAFSO, THOMAS ATTO,
PETER THOMAS, MANAR ABBO, ROBERT FRANKOWIAK,
BRIAN YALDOO.

**HAMMOCK BEACH PLAINTIFFS**: JOHN HINDO,
AMIR NAFSO, MAHER BAKKAL, SALAM BAKKAL,
TARIK DEHKO, ODAY KARMO, ALBERT JONNA,
MARIA HARRIS, JEFF GEORGE, SAAD NANNOSHI,
RAID AYAR, FADI HAKIM,
JOHNNY OROW, AMMAR KATTOULA, STEVE OROW,
JIMMY RABBAN, DONALD GEORGE, JOHN ABBO,
NABIL ZAWAIDEH, RAID AYAR,
BRIAN YALDOO, ALEC SHOUNEYIA, FARIS NAIMI,
JASON OROW, WALLY AMMORI, SAM DENHA,
QAIS MANNA, KARLA ATCHOO, MICHAEL DOUGLAS

GEORGE ABRO, JAMAL SINAWI, JERRY RABBAN,
LAITH AYAR, JASON NAJOR, KEVIN JAPPAYA,
BRIAN NAJOR, PAUL HAKIM, CONNIE
YASSO, JABRAN YASSO, MARK DENHA,
KEVIN DENHA. RAAD KONJA, NEMIR NADAR,
RAYMOND HESANO, HAITHEM SEBOU, STEVE
BAND, RAAD KASHAT, HANNA KASHAT, JEFF
YONO, MANAR ABBO, DAVID DABISH, MARVIN
YONO, GHASSAN LOUSSIA, JAMES AKOURI, WAFA
JAMIL, MARK GEORGE, MICHAEL DENHA, JOHN
DENHA, JEFFREY DENHA, DANI, SITTO, DURAID
YOUSIF, RICK NAJOR, JAMMY ABRO.

        Plaintiffs,

vs.

THE GINN COMPANY,
GINN REAL ESTATE COMPANY, LLC,
CAMERON, DAVIS, & GONZALEZ
SUNTRUST BANK
GINN-LA WILDERNESS LTD., LLLP,
GINN-LA HAMMOCK BEACH LTD., LLLP
GINN-LA ORLANDO LTD., LLLP,
GINN-LA PINE ISLAND LTD., LLLP
TESORO PRESERVE PROPERTY OWNERS ASSOCIATIONS, INC.
TESORO CLUB, LLC
THE CONSERVATORY PROPERTY OWNER'S ASSOCIATION, INC.
OCEAN HAMMOCK HOMEOWNERS ASSOCIATION, INC.
HARBOR VILLAGE MARINA PROPERTY OWNERS ASSOCIATION, INC.
BELLA COLLINA MASTER ASSOCIATION, INC.
BELLA COLLINA PROPERTY OWNERS ASSOCIATION, INC.
REUNION RESORT & CLUB OF ORLANDO MASTER ASSOCIATION, INC.
GINN PROPERTY MANAGEMENT, INC.
GINN TESORO GOLF, LLC
GINN RESORT MANAGEMENT, LLC
REUNION RESORT MANAGEMENT, LLC
THE REUNION CLUB OF ORLANDO, LLC
THE BELLA COLLINA CLUB, LLC
TESORO PROPERTY OWNERS' ASSOCIATION, INC.
TESORO GOLF CLUB CONDOMINIUM, LLC
TESORO BEACH CLUB CONDOMINIUM, LLC
THE GARDENS AT HAMMOCK BEACH PROPERTY OWNERS' ASSOCIATION, INC.
HAMMOCK BEACH RIVER CLUB, LLC
HAMMOCK BEACH RESORT MANAGEMENT, LLC
HAMMOCK BEACH II, LLC
HAMMOCK BEACH III, LLC

THE HAMMOCK BEACH ESTATES HOME OWNER'S ASSOCIATION, INC.
HAMMOCK BEACH PROPERTY OWNERS ASSOCIATION, INC.
HAMMOCK BEACH DISCOVERY CENTER, LLC
HAMMOCK BEACH RESORT CO., LLC


      Defendants.

MEKANI, OROW, MEKANI,
SHALLAL, HAKIM & HINDO, P.C.
Joseph A. Shallal (P57024)
Attorneys for Plaintiffs
21711 W. 10 Mile Rd., Ste. 237
Southfield, MI 48075
(248) 223-9830
(248) 223-9832 (Fax)

## PLAINTIFFS' FIRST AMENDED COMPLAINT
## AND JURY DEMAND

      NOW COMES, Plaintiffs by and through their attorneys, MEKANI, OROW, MEKANI,

SHALLAL, HAKIM & HINDO, and for their First Amended Complaint against Defendants

state as follows:

## JURISDICTION AND VENUE

      1.     This action is brought pursuant to 28 U.S.C. 1331 and arises under Public Law

90-448, as amended found in Title 15 United States Code 1701 et seq., more commonly known

as the "Interstate Land Sales Full Disclosure Act"(hereinafter "ILSA"), all as more fully set forth

herein.    That the jurisdiction of the court is invoked pursuant to 15 U.S.C. 1701.

      2.     This action also arises under the Securities and Exchange Act of 1934, Chapter 4,

Stat. 881, 15 U.S.C. 78j and Rule 10b-5 promulgated pursuant to the Act (17 C.F.R. 240.10B-5)

as more fully appears below.   That the jurisdiction of this Court is invoked pursuant to the

provisions of the Securities and Exchange Act of 1934, Section 27, 48 Stat. 902 (15 U.S.C. 78

aa).

3.      This Court has subject matter jurisdiction over the claims asserted in this complaint primarily due to the Defendants' use of the means and instrumentalities of interstate and foreign commerce, including the United States mail under 15 United States Code 1701 et seq., more commonly known as the "Interstate Land Sales Full Disclosure Act, Section 10 of the Securities Act, 15 U.S.C. 78j and Rule 10b(5), and under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1964 .

4.      This Court also has subject matter jurisdiction under 42 U.S.C. 1332 (a)(1) , because of diversity between the parties.

5.      Under the authority of 28 U.S.C. 1367(a), this Court has supplemental subject matter jurisdiction over all common-law claims asserted in this Complaint.

6.      This Court has personal jurisdiction over the Defendants for reasons that include the following actions which occurred in the State of Michigan:

    a.  The Defendants by use of means and instrumentalities of interstate commerce solicited Plaintiffs in Michigan to purchase vacant residential lots (the "Lots") in Florida.

    b.  Defendants sent brochures and marketing materials advertising the Lots and the opportunity to own Lots in one or more of the following: Ginn-LA Wilderness Ltd., LLLP, also known as Tesoro, Ginn-LA Hammock Beach Ltd., LLLP, also known as Hammock Beach, Ginn-LA Orlando Ltd., LLLP, also known as Reunion or Ginn-LA Pine Island Ltd., LLLP, also known as Bella Collina ("Ginn Developments") to prospective purchasers in the State of Michigan as well as other States.

4

c.   Defendants sent pricing lists for the Lots to Plaintiffs via federal Express Mail in Michigan and other States.

d.   Defendants hosted seminars in Michigan regarding purchasing Florida property in the Ginn Developments, one which was held as recently as March 2007.

e.   Defendant by use of mail and e-mail has sent several solicitation letters and requests for Michigan Plaintiffs to visit and purchase Lots in the Ginn Developments in Florida.

f.   Defendant has offered discounts on hotel stays and golf outings and has sent gifts to Michigan Plaintiffs to entice Plaintiffs to visit the Ginn Developments by way of sending solicitation to individuals in Michigan.

g.   Defendant has utilized the services of Florida licensed brokers and agents in soliciting Michigan Plaintiffs to visit and purchase in the various Ginn Developments.

h.   Defendant, through its escrow agents, mailed all closing documents to Michigan for signature by Plaintiffs.

i.   The Defendant has transacted business in Michigan and the offers for the purchase and sale of Florida Lots occurred in Michigan.

7.   Venue is appropriately laid in this Court under 28 U.S.C. 1391 and 18 U.S.C. 1965 because Defendant is a corporation with significant and material minimum contacts with the State of Michigan and because the transactions, acts, practices and courses of business constituting the actions complained of occurred within the State of Michigan, or elsewhere in the

United States, and the interests of justice require that parties not residing in this State be brought before the Court.

## PARTIES

8.      Plaintiffs are and were residents of the State of Michigan who signed Purchase Agreements, through the Power of Attorney process, on various Lots in various developments from Ginn through its affiliate companies which are more detailed below.

9.      The Ginn Company, (hereinafter "Ginn") is a corporation organized under the laws of the State of Georgia and authorized to do business in the State of Florida.

10.     Upon information and belief, Ginn Real Estate Company, (hereinafter "Real Estate Company") is a corporation organized under the laws of the State of Florida.

11.     Upon information and belief, Ginn-LA Wilderness Ltd., LLLP, also known as Tesoro, Ginn-LA Hammock Beach Ltd., LLLP, also known as Hammock Beach, Ginn-LA Orlando Ltd., LLLP, also known as Reunion or Ginn-LA Pine Island Ltd., LLLP, also known as Bella Collina ("Ginn Development's") are corporations authorized to do business in the State of Florida.

12.     Upon information and belief, Tesoro Preserve Homeowners Association, Inc., Tesoro Club, LLC, The Conservatory Property Owner's Association, Inc., Ocean Hammock Homeowner's Association, Inc., Harbor Village Marina Property Owner's Association, Inc., Bella Collina Master Association, Inc., Bella Collina Property Owners Association, Inc., and Reunion Resort & Club of Orlando Master Association, Inc., The Reunion Club of Orlando, LLC, The Bella Collina Club, LLC, Tesoro Property Owners' Association, Inc., Tesoro Golf Club Condominium, LLC, Tesoro Beach Club Condominium, LLC, The Gardens at Hammock

6

Beach Property Owners' Association, Inc., Hammock Beach River Club, LLC, Hammock Beach Resort Management, LLC, Hammock Beach II, LLC, Hammock Beach III, LLC, The Hammock Beach Estates Home Owner's Association, Inc., Hammock Beach Property Owners Association, Inc., Hammock Beach Discovery Center, LLC, Hammock Beach Resort Co., LLC, are corporations authorized to do business in the State of Florida.

13.     Cameron, Davis & Gonzalez is a Florida Law Firm and was the escrow agent used to close the transactions and was the company designated by Ginn as the Power of Attorney to be used if a purchaser wanted to purchase a Lot.

14.     Suntrust Bank is a banking institution incorporated in Georgia and transacting business in various states.  Suntrust Bank issued several loans to purchasers of Ginn properties while the principals of Ginn were sitting on the Suntrust board of directors.

### REUNION PLAINTIFFS

15.     Bassam Murad closed on his purchase of lot 251 in the Reunion Development on or about February 25, 2005.

16.     Bassam Murad closed on his purchase of lot 145 in the Reunion Development on or about December 31, 2004.

17.      Bassam Murad Closed on his purchase of lot 13 in the Reunion Development on or about April 15, 2005.

18.     Saad Nannoshi closed on his purchase of lot 60 in the Reunion Development on or about July 15, 2005.

19.     KO Florida Properties, Inc., closed on its purchase of lot 167 in the Reunion Development on or about March 22, 2005.

7

20.     Sam Orow closed on his purchase of lot 221 in the Reunion Development on or about January 21, 2005.

21.     Sam Orow closed on his purchase of lot 196 in the Reunion Development on or about January 31, 2005.

22.     Amir Nafso closed on his purchase of lot 121 in the Reunion Development on or about January 13, 2005.

23.     Andrew Najor closed on his purchase of lot 12 in the Reunion Development on or about June 16, 2005.

24.     Amar Toma closed on his purchase of lot 195 in the Reunion Development on or about March 18, 2005.

25.     David Kashat closed on his purchase of lot 191 in the Reunion Development on or about November 13, 2004.

26.     Roger Denha closed on his purchase of lot 268 in the Reunion Development on or about June 10, 2005.

## TESORO PLAINTIFFS

27.     Saad Nannoshi closed on his purchase of lot 268 in the Tesoro Development on or about May 9, 2005.

28.     Saad Nannoshi closed on his purchase of lot 49 in the Tesoro Development on or about April 28, 2005.

29.     Kevin Jappaya closed on his purchase of lot 237 in the Tesoro Development on or about September 14, 2005.

30.     Terry Farida closed on his purchase of lot 99 in the Tesoro Development on or about May 20, 2005.

31.     Ramiz Sheena closed on his purchase of lot 54 in the Tesoro Development on or about January 31, 2005.

32.     Frank Awdish and Fadi Hakim closed on their purchase of lot 177 in the Tesoro Development on or about April 14, 2005.

33.     Frank Awdish closed on his purchase of lot 65 in the Tesoro Development on or about January 26, 2005.

34.     Frank Awdish closed on his purchase of lot 263 in the Tesoro Development on or about April 25, 2005.

35.     D.H.G. Properties, LLC and Donald George closed on their purchase of lot 50 in the Tesoro Development on or about January 31, 2005.

36.     Nabhan Mekani and Jimmy Rabban closed on their purchase of Lot 235 in the Tesoro Development on or about June 10, 2005.

37.     Nabhan Mekani and Jimmy Rabban closed on their purchase of Lot 234 in the Tesoro Development on or about June 10, 2005.

38.     Ronnie Boji closed on his purchase of lot 6 in the Tesoro Development on or about September 2, 2005.

39.     Jimmy Rabban closed on his purchase of lot 66 in the Tesoro Development on or about February 4, 2005.

40.     Albert Jonna and Julian Jaddua closed on their purchase of lot 281 in the Tesoro Development on or about January 21, 2005.

41.     Nancy Elia closed on her purchase of lot 192 in the Tesoro Development on or about January 20, 2005.

42.     Athir Nafso closed on his purchase of lot 202 in the Tesoro Development on or about January 20, 2005.

43.     Peter Thomas and Thomas Atto closed on his purchase of lot 196 in the Tesoro Development on or about June 15, 2005.

44.     Manar Abbo closed on his purchase of lot 79 in the Tesoro Development or about April 1, 2005.

45.     Robert Frankowiak closed on his purchase of lot 23 in the Tesoro Development or about June 14, 2005.

46.     Brian Yaldoo closed on his purchase of lot 158 in the Tesoro Development or about April, 2005.

## BELLA COLLINA PLAINTIFFS

47.     Frank Awdish and Fadi Hakim closed on their purchase of lot 122 in the Bella Collina Development on or about March 31, 2005.

48.     Amir Nafso closed on his purchase of lot 140 in the Bella Collina Development on or about April 15, 2005.

49.     Ramy Sesi closed on his purchase of lot 192 in the Bella Collina Development on or about May 13, 2005.

50.     Albert and Grace Jonna closed on their purchase of lot 15 in the Bella Collina Development on or about June 30, 2005.

10

51.     Mike Jonna closed on his purchase of lot 50 in the Bella Collina Development on or about July 29, 2005.

52.     Tim Foumia and Sam Denha closed on their purchase of lot 55 in the Bella Collina Development on or about June 24, 2005.

53.     Johnny Karmo closed on his purchase of lot 59 in the Bella Collina Development on or about June 13, 2005.

54.     Saad Nannoshi closed on his purchase of lot 118 in the Bella Collina Development on or about July 15, 2005.

55.     Isam Jonna closed on his purchase of lot 151 in the Bella Collina Development on or about July 11, 2005.

56.     Stephen Najor closed on his purchase of lot 209 in the Bella Collina Development on or about June 9, 2005.

57.     Vincent Najor closed on his purchase of lot 216 in the Bella Collina Development on or about June 9, 2005.

58.     Nabil Nannoshi, Frank Awdish, Saad Nannoshi and Fadi Hakim closed on their purchase of lot 217 in the Bella Collina Development on or about July 15, 2005.

59.     Sam Nannoshi and Saad Nannoshi closed on their purchase of lot 218 in the Bella Collina Development on or about July 15, 2005.

60.     Saad and Vera Nannoshi closed on their purchase of lot 273 in the Bella Collina Development on or about July 15, 2005.

61.     Jack Abbo closed on his purchase of lot 274 in the Bella Collina Development on or about June 13, 2005.

62.     Imad Jonna and Jamila Jonna closed on their purchase of lot 281 in the Bella Collina Development on or about April 25, 2005.

63.     Ronnie Boji and Majid and Sylvia Dabish closed on their purchase of lot 476 in the Bella Collina Development on or about June 17, 2005.

64.     Allan Saroki, Kevin Atchoo, Louie Barbat, Ramiz Sheena, and Larry Najor closed on their purchase of lot 135 in the Bella Collina Development on or about April 15, 2005.

65.     Ronnie Jamil and Brian Yaldoo closed on their purchase of lot 229 in the Bella Collina Development on or about July 29, 2005.

66.     Faris Naimi closed on his purchase of lot 65 in the Bella Collina Development on or about July 8, 2005.

67.     Shawn Jappaya and Kevin Jappaya closed on their purchase of lot 281 in the Bella Collina Development on or about June 13, 2005.

68.     Donald George closed on his purchase of lot 55 in the Bella Collina Development on or about October 28, 2004.

69.     Faiz Mansour closed on his purchase of lot 72 in the Bella Collina Development on or about May 4, 2005.

70.     Ray Hesano closed on his purchase of lot 49 in the Bella Collina Development on or about June 1, 2004.

71.     Ghassan Alkamano and Jennifer Alkamano closed on their purchase of lot 24 in the Bella Collina Development on or about June 13, 2005.

72.     Waad Khemmoro closed on his purchase of lot 132 in the Bella Collina Development on or about July 25, 2005.

12

73.     Ramzi Faraj closed on his purchase of lot 284 in the Bella Collina Development on or about June 13, 2005.

74.     Paul George closed on his purchase of lot 128 in the Bella Collina Development on or about March 7, 2005.

## HAMMOCK BEACH PLAINTIFFS

75.     Amir Nafso and John Hindo closed on their purchase of lot 16 in the Hammock Beach Development on or about April 25, 2005.

76.     Amir Nafso closed on his purchase of lot 20 in the Hammock Beach Development on or about April 25, 2005.

77.     Maher Bakkal closed on his purchase of lot 236 in the Hammock Beach Development on or about July 1, 2005.

78.     Tarik Dehko closed on his purchase of lot 290 in the Hammock Beach Development on or about April 25, 2005.

79.     Maher Bakkal closed on his purchase of lot 153 in the Hammock Beach Development on or about May 5, 2005.

80.     Albert Jonna and Maria Harris closed on their purchase of lot 285 in the Hammock Beach Development on or about April 25, 2005.

81.     Jeff George, Saad Nannoshi, and Raid Ayar closed on their purchase of lot 8 in the Hammock Beach Development on or about May 27, 2005.

82.     Fadi Hakim closed on his purchase of lot 321 in the Hammock Beach Development on or about August 8, 2005.

83.     Johnny Orow closed on their purchase of lot 126 in the Hammock Beach Development on or about April 25, 2005.

84.     Ammar Kattola and Steve Orow closed on their purchase of lot 309 in the Hammock Beach Development on or about April 25, 2005.

85.     Jimmy Rabban closed on his purchase of lot 44 in the Hammock Beach Development on or about May 31, 2005.

86.     Raad Konja closed on his purchase of lot 22 in the Hammock Beach Development on or about June 13, 2005.

87.     Donald George and John Abbo closed on their purchase of lot 301 in the Hammock Beach Development on or about April 25, 2005.

88.     Nabil Zawaideh closed on his purchase of lot 65 in the Hammock Beach Development on or about May 16, 2005.

89.     Raid Ayar closed on his purchase of lot 67 in the Hammock Beach Development on or about April 29, 2005.

90.     Brian Yaldoo closed on his purchase of lot 97 in the Hammock Beach Development on or about May 6, 2005.

91.     Alec Shouneyia closed on his purchase of lot 209 in the Hammock Beach Development on or about April 25, 2005.

92.     Faris Naimi closed on his purchase of lot 15 in the Hammock Beach Development on or about April 25, 2005.

93.     Jason Orow closed on his purchase of lot 233 in the Hammock Beach Development on or about May 20, 2005.

14

94.     Wally Ammori and Sam Denha closed on their purchase of lot 261 in the Hammock Beach Development on or about April 25, 2005.

95.     Qais Manna and Karla Atchoo closed on their purchase of lot 156 in the Hammock Beach Development on or about May 6, 2005.

96.     Raad Konja closed on his purchase of lot 61 in the Hammock Beach Development on or about April 25, 2005.

97.     Nemir Nadar closed on his purchase of lot 160 in the Hammock Beach Development on or about April 25, 2005.

98.     George Abro closed on his purchase of lot 289 in the Hammock Beach Development on or about April 25, 2005.

99.     Jamal Sinawi closed on his purchase of lot 13 in the Hammock Beach Development on or about May 13, 2005.

100.    Jerry Rabban closed on his purchase of lot 223 in the Hammock Beach Development on or about April 25, 2005.

101.    Laith Ayar closed on his purchase of lot 18 in the Hammock Beach Development on or about May 10, 2005.

102.    Jason Najor and Kevin Jappaya closed on their purchase of lot 163 in the Hammock Beach Development on or about May 20, 2005.

103.    Brain Najor and Paul Hakim closed on their purchase of lot 127 in the Hammock Beach Development on or about July 25, 2005.

104.    Jabran and Connie Yasso closed on their purchase of lot 272 in the Hammock Beach Development on or about June 6, 2005.

15

105.    Mark Denha closed on his purchase of lot 227 in the Hammock Beach Development on or about May 3, 2005.

106.    Kevin Denha closed on his purchase of lot 203 in the Hammock Beach Development on or about April 27, 2005.

107.    Manar Abbo closed on his purchase of lot 2 in the Hammock Beach Development on or about April 25, 2005.

108.    Jeff Yono closed on his purchase of lot 41 in the Hammock Beach Development on or about April 25, 2005.

109.    Raad Kashat and Hanna Kashat closed on their purchase of lot 100 in the Hammock Beach Development on or about June 23, 2005.

110.    Raad Kashat closed on his purchase of lot 21 in the Hammock Beach Development on or about May 13, 2005.

111.    Steve Band closed on his purchase of lot 113 in the Hammock Beach Development on or about June 21, 2005.

112.    Brian Najor closed on his purchase of lot 17 in the Hammock Beach Development on or about April 25, 2005.

113.    Haitham Sebou closed on his purchase of lot 239 in the Hammock Beach Development on or about May 20, 2005.

114.    Raymond Hesano closed on his purchase of lot 189 in the Hammock Beach Development on or about April 25, 2005.

115.    David Dabish and Marvin Yono closed on their purchase of lot 212 in the Hammock Beach Development on or about April 25, 2005.

16

116.     David Dabish and Marvin Yono closed on their purchase of lot 49 in the Hammock Beach Development on or about April 25, 2005.

117.     Ghassan Loussia closed on his purchase of lot 11 in the Hammock Beach Development on or about April, 2005.

118.     James Akouri closed on his purchase of lot 5 in the Hammock Beach Development on or about April, 2005.

119.     Wafa Jamil closed on her purchase of lot 3 in the Hammock Beach Development on or about April, 2005.

120.     Mark George closed on his purchase of lot 109 in the Hammock Beach Development on or about April, 2005.

121.     Michael Denha closed on his purchase of lot 170 in the Hammock Beach Development on or about April, 2005.

122.     John Denha closed on his purchase of lot 228 in the Hammock Beach Development on or about April, 2005.

123.     Jeffrey Denha closed on his purchase of lot 232 in the Hammock Beach Development on or about April, 2005.

124.     Dani Sitto closed on his purchase of lot 278 in the Hammock Beach Development on or about April, 2005.

125.     Duraid Yousif closed on his purchase of lot 4 in the Hammock Beach Development on or about April, 2005.

126.     Rick Najor closed on his purchase of lot 336 in the Hammock Beach Development on or about April, 2005.

17

127.    Jammy Abro closed on his purchase of Lot 331 in the Hammock Beach Development on or about April 25, 2005.

**GENERAL FACTS**

128.    Defendant, The Ginn Company, is a parent company of a number of subsidiaries that collectively form the company which is a close network of investors located in various portions of the world that act as a single enterprise offering customers a wide variety of condominium units and vacant lots and a choice of locale in which to purchase those condominium units and vacant lots.

129.    The Ginn Company is a resident of the State of Georgia which operates through its Company as well as several Affiliated Entities including Ginn Real Estate Company, Ginn-LA Wilderness Ltd., LLLP,  Ginn-LA Hammock Beach Ltd., LLLP, Ginn-LA Orlando Ltd., LLLP, or Ginn-LA Pine Island Ltd., LLLP (collectively referred to as "Affiliated Entities') by selling condominium units and vacant lots to purchasers.  (Tesoro Preserve Homeowners Association, Inc., Tesoro Club, LLC, The Conservatory Property Owner's Association, Inc., Ocean Hammock Homeowner's Association, Inc., Harbor Village Marina Property Owner's Association, Inc., Bella Collina Master Association, Inc., Bella Collina Property Owners Association, Inc., and Reunion Resort & Club of Orlando Master Association, Inc., The Reunion Club of Orlando, LLC, The Bella Collina Club, LLC, Tesoro Property Owners' Association, Inc., Tesoro Golf Club Condominium, LLC, Tesoro Beach Club Condominium, LLC, The Gardens at Hammock Beach Property Owners' Association, Inc., Hammock Beach River Club, LLC, Hammock Beach Resort Management, LLC, Hammock Beach II, LLC, Hammock Beach III, LLC, The Hammock Beach Estates Home Owner's Association, Inc., Hammock Beach

Property Owners Association, Inc., Hammock Beach Discovery Center, LLC, Hammock Beach Resort Co., LLC, are also referred to herein sometimes as "Associations" and sometimes as "Affiliated Entities").

130.    Plaintiffs, being residents of Michigan, were solicited by Ginn and Ginn Real Estate Agents via mail, email, and telephone to purchase Lots in Florida.

131.    Upon information and belief, Ginn-LA Wilderness Ltd., LLLP, Ginn-LA Hammock Beach Ltd., LLLP, Ginn-LA Orlando Ltd., LLLP, or Ginn-LA Pine Island Ltd., LLLP are developments in excess of 500 Lots each, together with certain unimproved land, situated in various Counties in the State of Florida.

132.    Ginn Real Estate Agents and brokers, through Ginns' Affiliated Entities, marketed, solicited, promoted and sold various properties to prospective purchasers.  Upon information and belief, the Ginn Real Estate Company was set up for the exclusive purpose of continuing the stream of sales and purchases without complying with the ILSA disclosure requirements.  Basically, in order to circumvent ILSA disclosure requirements and create more profits for its investors, in the form of a commission, Ginn, through its Real Estate Company would solicit, list and sell properties multiple times. In essence, Ginn would create more sales using unsuspecting purchasers and sellers thereby evading the ILSA disclosure requirements.

133.    Upon information and belief, Ginn Real Estate Agents and brokers would call prospective purchasers and state that as soon as a property was purchased, the agents could immediately sell the properties at a substantial profit.

134.    After Ginn's scheme began to reach its peak, Ginn agents began using the listed sales prices of the Plaintiffs' properties as "bait" to lure other prospective purchasers away from

Plaintiffs' properties to properties owned and held by Ginn by demonstrating to the prospective purchaser that Ginn could offer a substantially reduced price in comparison to those prices being offered for Plaintiffs' properties.

135.    Plaintiffs were lured with grand marketing materials which would be sent via federal express to the Plaintiffs which materials promoted the property.  Ginn would require that due to overwhelming early demand for Lots within the development, the only way Plaintiffs could obtain the right to purchase a Lot would be to do so by using a power of attorney that was selected by Ginn.  Ginn established a relationship with a firm named Cameron, Davis and Gonzales who would act as an agent to Plaintiffs pursuant to a power of attorney while in fact Cameron, Davis and Gonzales acted as aiders and abettors to Defendants.  Upon information and belief, using a power of attorney was a scheme to circumvent ILSA disclosure requirements. The power of attorney instrument was not specific to any particular Lot but gave the agent acting as the power of attorney the right to secure a Lot and sign a purchase agreement on behalf of Plaintiffs if Plaintiffs were awarded a Lot.  Once Plaintiffs were awarded a Lot at what Ginn called a "property launch", Cameron, Davis & Gonzalez would sign a purchase agreement and mail Plaintiffs an executed purchase agreement. Cameron, Davis & Gonzalez throughout its representation of Plaintiffs acted in conflict of the interest of the Plaintiffs since Cameron, Davis & Gonzalez acted as power of attorney, escrow agent and closing agent all at the same time for each of the transactions thereby assisting Ginn in its scheme.

136.    Ginn and various Ginn Affiliated Entities always stated that the properties initially owned by Ginn in each development were sold at the property launches and represented that they had no excess inventory of properties.

137.    Upon information and belief, the Associations were established by Ginn and are fully controlled by Ginn or Ginn Affiliated Entities.

138.    The Associations are another method by which Ginn obtains money from unsuspecting Purchasers to further Ginn's scheme.

139.    The Associations charge membership fees, golf fees, and other fees when in fact several developments to date lack services and basic necessities and amenities that were promised by Ginn such as roads, water, and sewer, landscaping, golf courses, club houses, etc.

140.    When Plaintiffs refuse to pay the fees demanded by the Associations because Plaintiffs have not received any of the benefits which were to be provided by Ginn under the Purchase Agreements, the Associations use the judicial process and seek to foreclose on some of Plaintiffs' properties thereby coercing Plaintiffs into payment due to the risk of losing the property altogether.

141.    In furtherance of the coercion of the Plaintiffs under the scheme, Ginn Real Estate Company refuses to accept listings from owners wishing to sell their lots on the basis that the owners have not paid their fees to the Associations.

142.    Ginn is aware that all Plaintiffs want to list and sell their properties.

**INTERSTATE LAND SALES ACT**

143.    Pursuant to Section 1707 of ILSA, as required by Section 1703(a)(1)(B), Defendants, when engaged in interstate commerce, are required to provide all prospective purchasers with a detailed property report containing specific information about the property contained in a development prior to the execution of a purchase agreement.

21

144.     Plaintiffs herein have never received in advance from Ginn, any other defendant, or any other person, with respect to the property they purchased, a property report meeting the requirements of Section 1707 of ILSA, as required by Section 1703(a)(1)(B).

145.     During the property launches, in an attempt to induce Plaintiffs to purchase properties, Ginn Real Estate agents and brokers would give some Plaintiffs tours of the undeveloped properties and would make representations regarding how much certain purchasers paid for certain Lots and the amount of gain those individuals enjoyed and the short period of time in which the gain was realized.

146.     This method was also used to induce Plaintiffs who were not awarded a property at a property launch, to purchase Lots listed with the Ginn Real Estate Company.

147.     On several occasions Ginn Real Estate agents would call Plaintiffs with the enticement that a Lot had just become available and that the agents could immediately resell ("flip") the Lots at a significant profit immediately for and on behalf of the Plaintiffs.

148.     The brokers offered these lots pursuant to a common promotional plan under the same or similar sounding names or identities with common sales agents, common sales facilities and common advertising.  As a result, the brokers were required to comply with the requirements of ILSA even when they sold lots for other people other than the developer himself.

## SECURITIES AND EXCHANGE COMMISSION

149.     Ginn and its agents knew or had reason to know that the only reason these Lots were being purchased by Plaintiffs was for investment.

150.    Plaintiffs relied on Ginn and Ginn's Affiliated Entities in that the affiliates would be able to resell the Lots and that the Plaintiffs could expect profits solely from the efforts of Ginn and its affiliates who marketed, advertised, and sold the Lots.

151.    In essence Ginn has developed a multiple-tiered pyramid marketing scheme, which involves the use of offshore and United States entities and individuals in a joint venture to solicit and compensate investors in various related enterprises.

152.    The instruments used to facilitate the scheme were vacant lots purchased for investment purposes by second and third tier individuals such as Plaintiffs.

153.    Based on representations made in furtherance of its scheme, Ginn, its sales representatives, its agents and its affiliates including all other Defendants, misled Plaintiffs to believe that if Plaintiffs purchased Lots in the Ginn developments, Plaintiffs could immediately resell the units and realize substantial profits.

## **"PONZI SCHEME"**

154.    Upon information and belief, all Ginn Affiliated Entities were set up and run for the exclusive purpose of raising money from unsuspecting purchasers, like Plaintiffs, for the benefit of Ginn and Ginn Affiliated Entities.

155.    Upon information and belief, Ginn created a complicated maze of companies to be used in marketing, soliciting and promoting properties to potential purchasers in order to avoid the scrutiny of U.S. regulators including the Securities and Exchange Commission, while at the same time perpetuating a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted purchasers such as Plaintiffs.  Plaintiffs were promised large returns for their

investments.   Initial purchasers were actually paid the promised returns, which attracted additional purchasers such as Plaintiffs.   Ginn set up a regularly operating business whose purpose was to lure Plaintiffs into the scheme knowing that the units being sold were never worth the purchase price paid by Plaintiffs.

156.   Defendants understood that the second- and third-tier purchasers, who were the initial purchasers that were actually paid the promised returns, were used by Ginn for the exclusive purpose of marketing and promoting future fraudulent sales to Plaintiffs and similarly situated individuals.   Nevertheless, from the beginning, Defendants through the developments they controlled made substantial transfers and sales of properties, which resulted in new investor funds being used by Defendants to pay returns to old investors.

157.   Defendants created the multiple-tiered marketing scheme by, among other things, representing to Plaintiffs and similarly situated persons that the profits being realized by investors was legitimate and Defendants actively encouraged individuals to purchase properties in Ginn Developments.

158.   Given its intimate knowledge of the multiple-tier marketing scheme, Ginn and its affiliates knew that more property was being purchased, sold and resold, then should have been in a development that Ginn claims was developed for "end-users' and not "investors".

159.   Despite actual or constructive knowledge of the fraudulent nature of the marketing scheme, Ginn and its affiliates, through the Ginn Real Estate Company, continued in marketing the scheme and selling Lots to purchasers which resulted in new purchasers being used by Ginn and its affiliates to pay returns to old investors.

160.     Upon information and belief, in promoting the scheme, Ginn brought in several of its associates to purchase property for an inflated and manufactured value.  These manufactured purchase prices created a false and deceptive basis in the price for the properties.  This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties.  These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly much less than their appraisals.  When lenders realized that the properties had an inflated value, the lenders stopped issuing loans on these properties.

161.     In furtherance of the "Ponzi Scheme", purchasers were referred by Ginn to Suntrust Bank to obtain financing in order to purchase properties.  Upon information and belief, at that time, Edward R. "Bobby" Ginn, was on the board of directors of Suntrust Bank.

162.     Upon information and belief, Mr. Ginn, using his influence as a director of Suntrust Bank, made it easier for the initial purchasers to obtain financing knowing that the appraisals were inaccurate and manufactured.

163.     Suntrust Bank knew or should have known that Ginn was engaged in a "Ponzi Scheme" especially since the properties were substantially increasing in value in a relatively short period of time and then being resold and financed through Suntrust Bank for hundreds of thousands of dollars more than the properties were initially purchased for less than a few months before.

164.     Once Ginn sold enough vacant lots and other lenders began financing properties based upon the appraisals and the past loan history with Suntrust Bank, Suntrust Bank, with full

25

knowledge of the "Ponzi Scheme" ceased to finance any future purchasers knowing that the prices were inflated and knowing that the Ginn real estate market would soon collapse.

165.     Ginn knew that its actions would induce other people to purchase properties thereby generating billions of dollars in investment capital and lining the pockets of Ginn and Ginns affiliates in classic Ponzi fashion.

166.     Ginn regularly sent agents to other states to solicit purchasers for their developments. Ginn officials began to market the Multiple-Tier Marketing Scheme to these purchasers and potential purchasers making the representations of quick profits.

167.     Given Ginn's involvement in the Multiple-Tier Marketing Scheme, Ginn knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since the was no possibility of any value being added to the property by Ginn since the property values were already ridiculously over inflated.

168.     Ginn continued with the acts of selling properties to the second tier and third tier purchasers to satisfy Ginn's Affiliated Entities. Ginn's actions perpetuated the Ponzi scheme by ensuring that old investors were paid timely and strengthened the Ponzi scheme by enhancing the track record of the company by having a high turnover with significant profits.

**COUNT I**
**VIOLATION OF INTERSTATE LAND SALES ACT**
**FAILURE TO PROVIDE PROPERTY REPORT**

169.     Plaintiffs re-allege paragraphs 1 though 168 above as though fully restated herein.

170.    Defendants, THE GINN COMPANY, GINN REAL ESTATE COMPANY, LLC, GINN-LA WILDERNESS LTD., LLLP, GINN-LA HAMMOCK BEACH LTD., LLLP, GINN-LA ORLANDO LTD., LLLP, and GINN-LA PINE ISLAND LTD., LLLP ("Developer Defendants") are "developers" as defined under ILSA.

171.    Developer Defendants directly or indirectly used instruments of communication such as newspapers, emails, telephone calls and other methods of communication in interstate commerce and the mails with respect to the sale of property to Plaintiffs.

172.    The rules promulgated by the Housing and Urban Development require that certain information be provided in a Federal Property Report and that the report be filed with the department of Housing and Urban Development Land Sales Division. 15 U.S.C. 1701-1719.

173.    Pursuant to Section 1707 of ILSA, as required by Section 1703(a)(1)(B), Defendants, when engaged in interstate commerce, are required to provide all prospective purchasers with a detailed property report containing specific information about the property contained in a development prior to the execution of a purchase agreement.

174.    Plaintiffs herein have never received in advance from Ginn, any other defendant, or from any other person, with respect to the property they purchased, a property report meeting the requirements of Section 1707 of ILSA, as required by Section 1703(a)(1)(B).

175.    Defendants in violation of 15 U.S.C. 1703 (a)(1)(c) used property reports that omitted material facts required to be stated in the property report and therefore failed to meet the requirements of the Housing and Urban Development for some of the following reasons:

    a.   The property reports do not list the addresses of any lien holders.

    b.   The legal description of the development is not listed in the report.

    c.   The map of the property is not attached to the report.

    d.   The range of prices for the units is not listed in the report.

176.    Federal law requires that this information be listed in the property report irrespective of whether or not this information is provided in other documents.

177.    Defendants were aware of the law as they registered other developments with the Housing and Urban Development.

178.    Defendant failed to comply with ILSA by not delivering a property report as is required by the Department of Housing and Urban Development.

179.    Many of Plaintiffs, as permitted by ILSA, revoked the purchase agreements in writing as is required by ILSA.   **A copy of the revocation letters are attached as Exhibit 1 to Plaintiffs original Complaint and on file with the Court.**

180.    ILSA is a strict liability statute and the mere violation of not providing the property report puts Defendants in violation of ILSA and requires Defendants to repurchase all properties from Plaintiffs.

181.    Defendant have refused to re-purchase the Lots as is required under 15 U.S.C. 1703.

WHEREFORE, it is prayed that Plaintiffs be awarded all money paid by Plaintiffs to Defendant under the purchase agreement, damages, interest, actual attorneys' fees and other costs of this action, costs of travel to and from the developments, and for such other relief as the court deems fair, just, and equitable as is permitted under the Interstate Land Sales Act.

## COUNT II
## VIOLATION OF THE INTERSTATE LAND SALES ACT
## FRAUD AND DECEIT UPON PURCHASERS

182.    Plaintiffs re-allege the allegations contained in paragraph 1 through 181 as though fully restated herein.

183.    Defendants engaged in a plan or course of conduct to sell Plaintiffs Lots in an unfair, misleading and fraudulent manner in violation of Section 1703 (2)(A)(B) and (C) of ILSA.

184.    Defendant Ginn, (i) employed a scheme to defraud Plaintiffs; (ii) obtained money by means of untrue statements of material facts, and omitted to state material facts that were necessary in order to make statements that were made by Defendants to Plaintiffs  (in light of circumstances in which they were made and within the context of the overall offer and sale) not misleading, with respect to any information pertinent to the property; (iii) engaged in a practice and course of business which operated as fraud and deceit upon Plaintiffs.  Defendants engaged in the foregoing fraud and deceit by failing to properly inform plaintiffs of material facts relevant to make informed purchases by using marketing devices such as newspapers and direct mailings that gave false information to Plaintiffs.  In addition to the fraud and deceit stated in the facts above, Defendants engaged in other fraud and deceit by,:

        a.    Operating two-way radios during the time that the personal marketing with Plaintiffs was being conducted with continuous talk on said radios as to simulate sales activity in order to induce Plaintiffs to believe that there was a demand for the properties;

b.      Utilizing knowingly false claims of limited Lot availability and imminent price increases while in fact the prices were inflated due to false and deceptive appraisals manufactured by Defendants;

c.      Failing to disclose the actual costs of owing a Lot;

d.      Representing that significant profits could be made in a relatively short period of time.

e.      Representing that numerous investors already made substantial profits from sales of lots and that more investors were readily available to purchase the Lots from Plaintiffs at a substantial profit.

f.      Engaging in a "Ponzi Scheme" to permit unsuspecting Plaintiffs to believe that the properties were valued as represented while in fact such values were artificially inflated by Defendant.

g.      Defendants employed a scheme that created false indications of demand for the properties by requesting that every person who desired a property list as many alternative properties as possible in order of preference in the event that they could not get their first choice of property.  Instead of disclosing the actual number of "purchasers", Defendants disclosed the number of "selections" made by prospective purchasers and had the purchasers believing that there were multiple buyers for each lot when in fact Defendant knew that individuals were only awarded 1 lot and such action was misleading and acted as a deceit upon purchasers who had an intent as investors.  In addition, this action induced other prospective

purchasers to purchase properties that Ginn Real Estate Company was listing with the expectation of quick profits.

h.     Ginn always stated that the properties initially owned by Ginn in each development were sold at the property launches and represented that they had no excess inventory of properties.

Plaintiffs reasonably relied on the foregoing fraudulent and deceitful representations of Defendants and such representations, if true, were material to the Plaintiffs' decision to purchase the property in question.

185.    Also, in promoting one of its more expensive communities known as Bella Collina, Ginn created a scheme to "run up"- the prices of its lots and sell them to prospective purchasers.  Prior to the property launch, Ginn brought in a fake buyer who stated that he wanted to buy a lot from a purchaser in excess of $2,000,000 dollars.   The fake buyer executed a purchase agreement.   Had the sale been consummated, the owner would have made over $1,000,000 in profit.    Although Ginn stated to the owner that the purchaser had given a deposit, there in fact was never a deposit.  Word of this potential sale spread quickly and then Ginn had its property launch with investors desperately trying to get lots at the launch with the hopes of making a profit upon selling the property.   After the launch, and after all the people awarded properties at the launch closed, the owner was told that the purchaser backed out and in fact there was no deposit held by the realtor.

186.    Also, Ginn represented that certain Plaintiffs would have properties containing a golf course view.  After closing, Ginn moved the golf course in a manner to give the owner a completely different view than was promised thereby diminishing the value of the lot.

31

187.   Ginn should have known that its actions would induce other people to want to purchase properties.

188.   The acts complained of constitute a violation of Section 1703(a)(2)(a)(b)(c) of ILSA, entitling Plaintiffs, pursuant to Section 1703 and 1709 of ILSA, to revoke their contract or in the alternative to seek damages.

WHEREFORE, it is prayed that Plaintiffs be awarded all money paid by Plaintiffs to Defendant under the purchase agreement, damages, interest, actual attorneys' fees and other costs of this action, costs of travel to and from the developments, and for such other relief as the court deems fair, just, and equitable as is permitted under the Interstate Land Sales Act.

### COUNT III
### VIOLATION OF SECURITIES AND EXCHANGE RULES
### REGISTRATION, REPORTING AND DISCLOSURE REQUIREMENT.

189.   Plaintiffs re-allege the allegations contained in paragraph 1 though 188 as though fully restated herein.

190.   It is unlawful to sell any securities through use of means of interstate commerce without registering the security with the Securities and Exchange Commission, without complying with reporting requirements and by failing to disclose certain information.  15 U.S.C. 78(e).

191.   The term "security" as defined by the Securities and Exchange act of 1934 includes investment contracts.

192.   The Securities and Exchange Commission defines Investment Contracts as: contracts, transactions, or schemes whereby a person invests his money in and is led to expect profits solely from the efforts of the promoter or a third party.

193.    Several Ginn agents stated to Plaintiffs that the Lots, once purchased, could be sold at a significant profits.

194.    In reliance on those representations, Plaintiffs purchased lots.

195.    Ginn and its agents knew or had reason to know that the only reason these Lots that were being purchased by Plaintiffs, were for investment purposes.

196.    Ginn and its agent knew or had reason to know that the Plaintiffs were relying on Ginn and its agents to resell the properties.

197.    Upon information and belief, Ginn: (i) did not register the investment contracts with the Securities and Exchange Commission; (ii) did not comply with the reporting requirements of the Securities and Exchange Commission and; (iii) failed to disclose certain information to both the investor and the Securities and Exchange Commission in derogation of 15 U.S.C. 78.

198.    As a result of the actions of Ginn, Plaintiffs have suffered significant damages.

WHEREFORE, it is prayed that Plaintiffs be awarded all money paid by Plaintiffs to Defendant under the purchase agreement, damages, punitive damages, interest, actual attorneys' fees and other costs of this action, and for such other relief as the court deems fair, just, and equitable as is permitted under the Securities and Exchange Act.

## COUNT IV
## FALSE REPRESENTATION UNDER
## SECURTIES EXCHANGE ACT OF1934

199.    Plaintiffs reallege the factual allegations contained in paragraph 1 through 198 as though fully restated herein.

200.    The Defendant used an instrumentality of interstate commerce in connection with the securities transaction involved in this case by use of United States mail, via email, and telephone.

201.    Defendant made misrepresentations of material facts and failed and omitted to state material facts in connection with the securities transactions involved in this case.  Plaintiffs allege that the Defendants made the following false or misleading statements in derogation of 15 U.S.C. 78:

    a.  Ginn, its sales representatives, its agents and its affiliates including all other Defendants, stated that if Plaintiffs purchased Lots in the Ginn developments, Plaintiffs could immediately resell the units and realize substantial profits.

    b.  During the property launches, in an attempt to induce Plaintiffs to purchase properties, Ginn real estate agents and brokers would give Plaintiffs tours of the undeveloped properties and would make representations regarding how much certain purchasers paid for certain Lots and the amount of gain those individuals enjoyed and the short period of time in which the gain was realized without informing Plaintiffs that the property values were artificially inflated due to manufactured appraisals.

    c.  Ginn agents would call Plaintiffs with the enticement that a Lot had just become available and that the agents could immediately "flip" the lots at a significant profit immediately for and on behalf of the Plaintiffs when in fact Defendants knew there were no prospective purchasers who would purchase the properties from Plaintiffs.

d.  Ginn created and perpetuated a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted purchasers such as Plaintiffs. Plaintiffs were promised large returns for their investments.  Initial purchasers were actually paid the promised returns, which attracted additional purchasers such as Plaintiffs.  Ginn set up a regularly operating business, but Ginn's purpose was to lure Plaintiffs into the scheme knowing that the units being sold were never worth the purchase price paid by Plaintiffs.  Defendants created the multiple-tiered marketing scheme by, among other things, representing to Plaintiffs and similarly situated persons that the profits being realized by investors was legitimate and Defendants actively encouraged individuals to purchase properties in Ginn Developments.

e.  Ginn initially brought in several of its associates to purchase property for an inflated and manufactured value.  These manufactured purchase prices created a false and deceptive basis in the price for the properties.  This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties.  These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly much less than their appraisals and these false and manufactured values induced Plaintiffs to purchase the properties.

f.  Ginns failure to disclose that its principal Edward R. "Bobby" Ginn was a director of Suntrust Bank is an omission material fact since many purchasers financed

their purchase through Suntrust Bank.  Had Plaintiffs been aware of this conflict, Plaintiffs would not have purchased any properties and would have been skeptical of the entire Ginn organization.

202.    Defendants acted knowingly or with reckless disregard.  Pursuant to 15 U.S.C. 78u-4(b)(1), Plaintiffs allege that the facts and circumstances showing that the Defendants acted with the required state of mind, and at the time that the defendant made the false or misleading representations described above, they knew that they were false.

203.    Given Ginn's involvement in the Multiple-Tier Marketing Scheme, Ginn knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since there was no possibility of any value being added to the property by Ginn since the property values were already ridiculously over inflated.

204.    The representations had no other purpose than to induce Plaintiffs and persons similar to Plaintiffs to purchase property in developments owned by defendants. The representations were contained in a prospectus and in exhibits attached to the prospectus which clearly reveal to be sales brochures knowingly manufactured by Ginn. Thus, the false or misleading representations were made to the Plaintiffs by the Defendants with the intention that the Plaintiffs should rely on these representations with a clear intent to deceive, manipulate and defraud Plaintiffs.

205.    As a result of the representations by the Defendants, Plaintiffs had reason to justifiably rely and did justifiably rely on the representations as some Plaintiffs visited the developments, spoke to Ginn agents and investigated the claims of profitability, interviewed

prior investors who made claims of profits, and reviewed comparable sale reports that were supplied by Ginn.  In reliance on the Defendants' representations, which representations were false when made, Plaintiffs, by use of powers of attorney, entered into certain written investment contracts.

206.    As a proximate cause of Defendants misrepresentations, acts and omissions of the matters alleged above, the plaintiffs have been damaged and but for the misrepresentations, acts and omissions of Defendant such damage would not have occurred.

WHEREFORE; a judgment against all of the named Defendants determining that the sale of the investment contract to the Plaintiffs by the defendants was procured by a material misrepresentation, contrary to the provision of the Security Exchange Act of 1934, Chapter 4, Stat. 881, 15 U.S.C. 78j and Rule 10b-5, promulgated pursuant to the Act 17C.F.R. 240.10B-5) and therefore, this court should award Plaintiffs a judgment against all of the named Defendants in the amount of Plaintiff's losses, together with interest and a judgment for actual attorney's fees, costs of suit, and any and all other relief that appears to the court equitable under the circumstances.

## COUNT V
## "PONZI SCHEME"
## AND VIOLATION OF SECTION 10(b) OF
## THE SECURITIES AND EXCHANGE ACT

207.    Plaintiffs reallege the allegations contained in paragraphs 1 through 206 as though fully stated herein.

208.    All Ginn Affiliated Entities were set up and run for the exclusive purpose of raising money from unsuspecting purchasers, like Plaintiffs, for the benefit of Ginn and Ginn Affiliated Entities.

209.    Ginn created a complicated maze of companies to be used in marketing, soliciting and promoting properties to potential purchasers in order to avoid the scrutiny of U.S. regulators including the Securities and Exchange Commission, while at the same time perpetuating a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted purchasers such as Plaintiffs.  Plaintiffs were promised large returns for their investments.  Initial purchasers were actually paid the promised returns, which attracted additional purchasers such as Plaintiffs.  Ginn set up a regularly operating business, but Ginn's purpose was to lure Plaintiffs into the scheme knowing that the units being sold were never worth the purchase price paid by Plaintiffs.

210.    The Plaintiffs who became aware of this Ponzi Scheme, informed Ginn that they were revoking their contracts and demanded that Ginn re-purchase the Lots.

211.    Defendants understood that the second- and third-tier purchasers, who were the initial purchasers that were actually paid the promised returns, were used by Ginn for the exclusive purpose of marketing and promoting future fraudulent sales to Plaintiffs and similarly situated individuals.  Nevertheless, from the beginning, Defendants through the developments they controlled made substantial transfers and sales of properties, which resulted in new investor funds being used by Defendants to pay returns to old investors.

212.    Defendants created the multiple-tiered marketing scheme by, among other things, representing to Plaintiffs and similarly situated persons that the profits being realized by investors was legitimate and Defendants actively encouraged individuals to purchase properties in Ginn Developments.

213.     Given its intimate knowledge of the multiple-tier marketing scheme, Ginn and its affiliates knew that more property was being purchased, sold and resold, then should have been in a development that Ginn claims was developed for "end-users' and not "investors".

214.     Despite actual or constructive knowledge of the fraudulent nature of the marketing scheme, Ginn and its affiliates, through the Ginn Real Estate Company, continued in marketing the scheme and selling Lots to purchasers which resulted in new purchasers being used by Ginn and its affiliates to pay returns to old investors.

215.     In promoting the scheme, Ginn brought in several of its associates to purchase property for an inflated and manufactured value.  These manufactured purchase prices created a false and deceptive basis in the price for the properties.  This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties.  These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly much less than their appraisals.  When lenders realized that the properties had an inflated value, the lenders stopped issuing loans on these properties.

216.     In furtherance of the "Ponzi Scheme" purchasers were referred by Ginn to Suntrust Bank to obtain financing in order to purchase properties.  Upon information and belief, at that time, Edward R. "Bobby" Ginn, was on the board of directors of Suntrust Bank.

217.     Upon information and belief, Mr. Ginn, using his influence as a director of Suntrust Bank, made it easier for the initial purchasers to obtain financing knowing that the appraisals were inaccurate and manufactured.

218.    The success of the scheme depended on Ginns ability to find a complicit bank that would be willing to loan money to prospective purchasers of properties that were knowingly overvalued and that were worth much less than there appraisals and that would be willing to facilitate transactions.

219.    Suntrust Bank knew or should have known that Ginn was engaged in a "Ponzi Scheme" especially since the properties were substantially increasing in value in a relatively short period of time and then being resold and financed through Suntrust Bank for hundreds of thousands of dollars more than the properties were initially purchased for less than a few months before.

220.    Despite Suntrust's knowledge, it continued to provide loans for properties that could not sustain their value as if it did not have the knowledge or suspicions.

221.    Suntrust actions perpetuated the "Ponzi Scheme" and strengthened the "Ponzi Scheme" since Plaintiffs relied on what should have been Suntrust's normal diligent inquiry into the value of collateral before lending.

222.    Once Ginn sold enough units and vacant lots and other lenders began financing properties based upon the appraisals and the past loan history with Suntrust Bank, Suntrust Bank, with full knowledge of the "Ponzi Scheme" ceased to finance any future purchasers knowing that the prices were inflated and knowing that the Ginn real estate market would soon collapse.

223.    Ginn knew that its actions would induce other people to purchase properties thereby generating billions of dollars in investment capital and lining the pockets of Ginn and Ginns affiliates in classic Ponzi fashion.

224.    Ginn regularly sent agents to other states to solicit purchasers for their developments. Ginn officials began to market the Multiple-Tier Marketing Scheme to these purchasers and potential purchasers making the representations of quick profits.

225.    Given Ginn's involvement in the Multiple-Tier Marketing Scheme, Ginn knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since there was no possibility of any value being added to the property by Ginn since the property values were already ridiculously over inflated.

226.    Ginn continued with the acts of selling properties to the second tier and third tier purchasers to satisfy Ginn's Affiliated Entities. Ginn's actions perpetuated the Ponzi scheme by ensuring that old investors were paid timely and strengthened the Ponzi scheme by enhancing the track record of the company by having a high turnover with significant profits.

227.    By reason of such activities, Ginn and its affiliates have violated Section 10(b) of the Exchange Act 15 U.S.C. 78j(b) and Rule 10b(5) [17 C.F.R. 240.10b-5], promulgated under the Act ("Rule 10b-5 Violations").

228.    As a direct and proximate result of Ginn and its affiliates' Rule 10b-5 Violations, as described above, purchasers were unable to sell or recoup their money.  In addition, because the value of the properties decreased, the purchasers lost significant profits it could otherwise have made.

229.    As a direct and proximate result of Ginn and its affiliates' fraud and misrepresentation, Plaintiffs  were unable to sell or recoup their money.  In addition, because the

value of the properties decreased, the Plaintiffs lost significant profits it could otherwise have made.

WHEREFORE; a judgment against all of the named Defendants determining that the sale of the investment contract to the Plaintiffs by the Defendants was procured by a material misrepresentation, and were made contrary to the provision of the Security Exchange Act of 1934, Chapter 4, Stat. 881, 15 U.S.C. 78j and Rule 10b-5, promulgated pursuant to the Act 17C.F.R. 240.10B-5) and therefore this court should award Plaintiffs a judgment against all of the named defendants in the amount of Plaintiffs losses, together with interest and a judgment for actual attorney's fees, costs of suit, and any and all other relief that appears to the court equitable under the circumstances.

## COUNT VI
## VIOLATION OF STATE SECURITIES LAWS

230.    Plaintiffs repeat as if fully set forth here, the allegations in Paragraphs 1 through 229 above.

231.    At all relevant times, Ginn and affiliates, directly and indirectly, in connection with the offer, sale, and purchase of investments and securities, and in furtherance of the Multiple-Tier Marketing Scheme:

a.    Employed devices, schemes, and artifices to defraud including but not limited to those acts enumerated herein;

b.    Made untrue statements of material fact, including representations that Ginn and affiliates or both had thoroughly investigated the properties, that the Multiple-Tier Marketing Scheme and Ginn represented a legitimate investment, and that investments in the Multiple-Tier

Marketing Scheme and Ginn properties were safe when, in fact, investments in the Multiple-Tier Marketing Scheme and Ginn properties were neither safe nor legitimate;

       c.   Failed to state material facts, which were necessary to make the statements made, in light of the circumstances, not misleading; and

       d.   Engaged in transactions, practices, and a course of business, which operated as a fraud or deceit on purchasers and sellers of such investments and securities in many States within in the United States, including but not limited to Michigan.

232.   Ginn and its affiliates conduct, material misrepresentations, and omissions were justifiably relied on by prospective purchasers and their creditors in many States within the United States, including but not limited to, the states of Michigan.

233.   Ginn and its affiliates acted with knowledge and reckless disregard as to the truth of its communications described above.

234.   As a proximate result of Defendants' conduct, material misrepresentations and omissions, transactions, practices, and course of business, Plaintiffs are unable to sell the properties and have otherwise suffered loss and injury.

235.   Ginn and its affiliates' conduct, material misrepresentations, and omissions violated the laws of many states, including but not limited to the State of Michigan.

WHEREFORE, The Plaintiff requests that this Court render a judgment that: Awards actual damages consistent with the proofs submitted at trial,  Awards pre- and postjudgment interest as allowed by law, Awards the plaintiff reasonable attorney's fees;  Awards the plaintiff costs of suit; and Grant the plaintiff any and all other relief to which the plaintiff may be entitled.

43

## COUNT VII
## FRAUDULENT MISREPRESENTATIOIN

236.    Plaintiff realleges the allegations contained in counts 1 through 235 as though fully set forth herein.

237.    Defendants intentionally made the false representations of material facts as detailed above to Plaintiffs with regards to the Lots.

238.    Defendant's representations, as detailed above, were false when they were made.

239.    Defendant knew that its representations, as detailed above, were false when they were made or it made them recklessly, without regards to whether they were true or not.

240.    Defendant intended that Plaintiff rely on the representations detailed above.

241.    Plaintiff relied on Defendant's false representations detailed above in purchasing the units.

242.    As a result of Defendant's fraudulent misrepresentations detailed above, Plaintiff has suffered substantial economic losses.

WHEREFORE, Plaintiffs request that this court enter a judgment in Plaintiffs favor and against all Defendants and award the following damages: compensatory damages sufficient to compensate Plaintiffs for actual, consequential, and incidental losses sustained as a result of Defendant's wrongful actions; exemplary damages resulting from Defendant's intentional and malicious actions; interest, costs, and reasonable attorney fees; and any other relief as the Court deems just, fair and equitable.

## COUNT VIII
## INNOCENT MISREPRESENTATION

243.     Plaintiffs reallege the allegations contained in paragraphs 1 through 242 as if fully restated herein.

244.     Defendant's representations, as set forth in the preceding paragraphs, were made in connection with the making of a contract between Plaintiffs and Defendant.

245.     Plaintiffs would not have entered into the contract to purchase the Lots if Defendants had not made the representations as detailed above.

246.     Plaintiffs suffered substantial economic losses as a result of entering into the contract, and their losses benefited Defendants.

WHEREFORE, Plaintiffs request that this court enter a judgment in Plaintiffs favor and against all Defendants and award the following damages: compensatory damages sufficient to compensate Plaintiffs for actual, consequential, and incidental losses sustained as a result of Defendant's wrongful actions; exemplary damages resulting from Defendant's intentional and malicious actions; interest, costs, and reasonable attorney fees; and any other relief as the Court deems just, fair and equitable.

## COUNT IX
## VIOLATION OF
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. 1961 ET SEQ.

247.     Plaintiff realleges the allegations contained in counts 1 through 246 as though fully set forth herein.

248.     This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 et seq.

45

249.    The Ginn Company is an enterprise within the meaning of 18 U.S.C. 1961, which is engaged in, or the activities of which affect, interstate or foreign commerce. The fraudulent misrepresentations detailed above were made by Defendant to Plaintiffs.

250.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs, which was facilitated by use of the United States Mail, caused by Defendant, and resulting in mail fraud within the meaning of 18 U.S.C. 1341.

251.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs in violation of Securities Laws and resulting in fraud within the meaning of 18 U.S.C. 1961.

252.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961 (1)(B) .

253.    Security fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961 (1)(D) and 18 U.S.C. 1962.

254.    Defendant's multiple fraudulent misrepresentations as detailed above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5).

255.    Defendant and Defendant's agents, associates, and representatives, have conducted, and have conspired to conduct, the affairs of The Ginn Company through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c), (d) .

256.    As a direct and proximate result of these violations of 18 U.S.C. 1962 (a), (b), (c), (d) , Plaintiffs have suffered actual damages as a result of injury to its property.

257.    Defendant is liable to Plaintiff for treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. 1964(c) .

WHEREFORE, Plaintiff requests relief, as follows: that Plaintiff be granted judgment against all Defendants in the total amount of all damages suffered by it as a result of Defendant's wrongful acts; that Plaintiff be granted judgment against all Defendants for treble damages suffered by reason of injury to its property as a result of Defendant's violations of 18 U.S.C. 1962 (c); that Plaintiff be granted judgment against all Defendants for all costs of this action, including reasonable attorney's fees; and that this Court grant Plaintiff any other relief that it considers just and appropriate under the circumstances.

### JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Respectfully submitted,

MEKANI, OROW, MEKANI,
SHALLAL, HAKIM & HINDO P.C.


BY:     /s/ Joseph A. Shallal
        Joseph A. Shallal (P57024)
        Attorneys for Plaintiffs
        21711 W. 10 Mile Rd., Ste. 237
        Southfield, MI 48075
        (248) 223-9830
Date:   June 27, 2007          (248) 223-9832 (Fax)